UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


VERNON PINCKNEY,

                    Petitioner,

v.                                    Case No. 3:02-cv-667-J-32HTS

JAMES V. CROSBY, JR.,
et al.,

                    Respondents.

_____

**ORDER**

**I. Status**

On July 15, 2002, Petitioner Vernon Pinckney, who is
proceeding *pro se*, initiated this action by filing a Petition for
Writ of Habeas Corpus (Doc. #1) pursuant to 28 U.S.C. § 2254.
Petitioner filed an Amended Petition (Doc. #26) on February 25,
2003; a Second Amended Petition (Doc. #35) on January 26, 2004;
and, a Third Amended Petition (Doc. #50) on January 4, 2005.
Petitioner is now proceeding on the Third Amended Petition, in
which he challenges his 1997 state court (Duval County, Florida)
conviction for sale or delivery of cocaine and possession of
cocaine. Petitioner raises six claims: (1) ineffective assistance
of trial counsel for failure to properly investigate the case and
interview or call witnesses at the trial; (2) ineffective
assistance of trial counsel for failure to request a mistrial
during the prosecutor's closing argument; (3) the trial court erred

in denying his motions for mistrial on four separate occasions; (4) ineffective assistance of trial counsel due to a conflict of interest since counsel represented Petitioner and his co-defendant; (5) ineffective assistance of trial counsel for failure to advise him of the disadvantages of waiving his speedy trial rights and his right to obtain counsel; and, (6) ineffective assistance of trial counsel for failure to raise or preserve his <u>Batson</u>[1] claim.

Respondents filed an Answer in Response to Third Amended Petition for Writ of Habeas Corpus (Doc. #56) (hereinafter Response).  In support of their contentions, they submitted exhibits.[2] Petitioner has filed a Reply to Respondents' Answer to Petitioner's Third Amended Writ of Habeas Corpus (Doc. #55) (hereinafter Reply).  Petitioner has also submitted exhibits in support of his Third Amended Petition.  <u>See</u> Petitioner's Appendix (Doc. #51).[3]

## II. Procedural History

After a jury trial, Petitioner was convicted of cocaine possession and sale or delivery of cocaine.  On April 10, 1997, Petitioner was sentenced, as a habitual violent felony offender, to twenty (20) years for the sale or delivery of cocaine and five (5)

---

[1] <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

[2] This Court will hereinafter refer to Respondents' exhibits as "Ex."

[3] This Court will hereinafter refer to Petitioner's exhibits as "Petitioner's Ex."

2

years for possession of cocaine, to run concurrently.  On appeal, Petitioner raised the following claim:  the trial court reversibly erred in denying his motion for mistrial when the State harmfully commented on facts not in evidence during its closing argument. Ex. B.  On April 1, 1998, the appellate court per curiam affirmed. <u>Pinkney v. State</u>, 717 So.2d 1005 (Fla. 1st DCA 1998).[4]  The mandate issued on April 17, 1998.  Ex. B.

Petitioner filed a motion for post conviction relief on October 1, 1998, and subsequent amendments on November 13, 1998, and April 13, 1999.  Ex. C.  He raised the following grounds: (1) ineffective assistance of trial counsel for failure to properly object and move for a mistrial during the State's closing argument; (2) ineffective assistance of trial counsel for failure to request a competency examination prior to trial when counsel knew that Petitioner was not competent to stand trial; (3) ineffective assistance of trial counsel for failure to properly communicate a specific plea bargain offered by the prosecutor and for failure to advise him of the evidence against him in order to enable him to make an informed decision regarding the offer; (4) ineffective assistance of trial counsel for his failure to request a jury

---

[4] Petitioner Vernon Pinckney initiated this case under the name "Vernon Pinckney," which is his inmate committed name; however, he uses the name "Pinkney" as well.  <u>See</u> http://www.dc.state.fl.us/ActiveInmates (website for the Florida Department of Corrections).  This Court will hereinafter refer to him as Pinckney.

instruction on the independent act of the co-felon; (5) ineffective assistance of trial counsel for failure to assert the voluntary intoxication defense at trial; (6) ineffective assistance of trial counsel for failure to object to the habitual violent offender sentence (which the trial court imposed without following the proper procedures) and for failure to file a motion to correct sentence; (7) ineffective assistance of trial counsel for failure to investigate and call nine witnesses and two experts to testify at the trial; (8) ineffective assistance of trial counsel for allowing Petitioner to proceed to trial with an all white jury; (9) ineffective assistance of trial counsel for misleading Petitioner to testify; (10) ineffective assistance of trial counsel for not bringing out facts concerning the arrest; (11) ineffective assistance of trial counsel for failure to file proper discovery motions; (12) ineffective assistance of trial counsel for failure to file motions to suppress evidence seized and statements made upon his arrest; (13) ineffective assistance of trial counsel for failure to object, preserve for appeal and file a motion for judgment of acquittal based on the fact that the prosecutor excluded all eligible black jurors, thus forcing Petitioner to endure an all white jury; (14) ineffective assistance of trial counsel for conflict of interest (a) for representing both Petitioner and his co-defendant at the same time during the pretrial stage, and (b) for being under investigation for substance

4

abuse; (15) ineffective assistance of trial counsel for failure to preserve an issue for direct appeal (that the prosecutor had elicited statements from defense witness Tyrone Robinson that Petitioner had done his time); and, (16) the conviction was obtained by the use of evidence obtained pursuant to an unlawful arrest. Id.

On July 13, 2000, an evidentiary hearing was conducted with respect to four issues.[5] Ex. D, Transcript of the Evidentiary Hearing (hereinafter EH Tr.). The trial court, on August 16, 2000, denied the motion. Ex. C at 202-10. On March 6, 2002, the appellate court per curiam affirmed. Pinckney v. State, 810 So.2d 926 (Fla. 1st DCA 2002). The mandate issued on March 22, 2002. Ex. E.

On December 17, 2001, Petitioner filed a Petition for Writ of Habeas Corpus, which was denied on January 22, 2002. Ex. F. On September 30, 2002, Petitioner filed a Motion to Correct Illegal Sentence, which was denied. Ex. G. On December 4, 2003, the

---

[5] The trial court scheduled an evidentiary hearing on five issues (ineffective assistance of trial counsel for (1) failure to request a competency examination prior to trial when counsel knew that Petitioner was not competent to stand trial; (2) failure to properly communicate a plea bargain offered by the prosecutor; (3) failure to advise Petitioner of the evidence against him in order to enable him to make an informed decision regarding the plea offer; (4) failure to assert the voluntary intoxication defense at trial; and, (5) counsels' conflict of interest for representing both Petitioner and the co-defendant at the same time); however, Petitioner waived one issue: counsel's failure to assert the voluntary intoxication defense at trial. Ex. D, Transcript of the Evidentiary Hearing at 4-7; Ex. C at 205 (Claim 5).

appellate court per curiam affirmed, and the mandate issued on December 30, 2003. Id.

As previously noted, Petitioner initiated this action in this Court on July 15, 2002. This action was timely filed within the one-year limitation period for filing section 2254 petitions. See 28 U.S.C. § 2244(d)(1); Response at 3.

### III. EVIDENTIARY HEARING

This Court has carefully reviewed the record and, for the reasons set forth more fully below, concludes Petitioner is not entitled to an evidentiary hearing. A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief. Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted); Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing Townsend v. Sain, 372 U.S. 293 (1963)). Here, the pertinent facts of the case are fully developed in the record before the Court. Smith, 170 F.3d at 1054 (stating that a district court does not need to conduct an evidentiary hearing "if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel"). No evidentiary proceedings are required in this Court. High v. Head, 209 F.3d 1257, 1263 (11th Cir. 2000) (citing McCleskey v. Zant, 499 U.S. 467, 494 (1991)), cert. denied, 532 U.S. 909 (2001).

## IV.   STANDARD OF REVIEW

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA).   Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claims under 28 U.S.C. § 2254(d), as amended by AEDPA. Nelson v. Alabama, 292 F.3d 1291, 1294-95 (11th Cir. 2002), cert. denied, 538 U.S. 926 (2003); Fugate v. Head, 261 F.3d 1206, 1215 n.10 (11th Cir. 2001), cert. denied, 535 U.S. 1104 (2002); Wilcox v. Florida Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998), cert. denied, 531 U.S. 840 (2000).

The Eleventh Circuit has described the standard of review under AEDPA:

> Title 28 U.S.C. § 2254 governs the authority of the federal courts to consider applications for writs of habeas corpus submitted by state prisoners.   Section 2254 was amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), which was effective as of April 24, 1996.   AEDPA applies to all petitions filed after its effective date. . . .

> AEPDA "places a new constraint on a federal habeas court's power to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" by establishing a deferential standard for reviewing state court judgments in these cases.   Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).   Subsection (d) of § 2254 provides:

7

(d) An application for a writ of
habeas corpus on behalf of a person
in custody pursuant to the judgment
of a State court shall not be
granted with respect to any claim
that was adjudicated on the merits
in State court proceedings unless
the adjudication of the claim--

(1) resulted in a decision that was
contrary to, or involved an
unreasonable application of, clearly
established Federal law, as
determined by the Supreme Court of
the United States; or

(2) resulted in a decision that was
based on an unreasonable
determination of the facts in light
of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

AEDPA also makes clear that substantial
deference is to be accorded a state court's
findings of fact.  Section 2254(e)(1) provides
that "a determination of a factual issue made
by a State court shall be presumed to be
correct.  The applicant shall have the burden
of rebutting the presumption of correctness by
clear and convincing evidence."  28 U.S.C. §
2254(e)(1).

Henderson v. Campbell, 353 F.3d 880, 889-891 (11th Cir. 2003)

(footnote omitted), cert. denied, 125 S.Ct. 44 (2004).

Clearly, the new 28 U.S.C. § 2254(d) creates a more

deferential standard for federal court review of state court

adjudications:  "[u]nless a state court decision is directly

contrary to Supreme Court case law, we review state court findings

of fact and conclusions of law for reasonableness."  Van Poyck v.

8

Florida Dep't of Corr., 290 F.3d 1318, 1321 (11th Cir. 2002) (per curiam), cert. denied, 537 U.S. 812 (2002), 537 U.S. 1105 (2003); Mitchell v. Esparza, 540 U.S. 978 (2003) (per curiam) (holding that the Ohio Court of Appeals' decision was not "contrary to" or an "unreasonable application" of clearly established federal law and stressing "the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)").

The "contrary to" and "unreasonable application" clauses have independent meaning and provide separate bases for federal habeas review:

> "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at 1523 (O'Connor, J., concurring). The "contrary to" clause "suggests that the state court's decision must be substantially different" from the controlling legal precedent. Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), cert. denied, --- U.S. ---, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002) (quoting Williams, 529 U.S. at 405, 120 S.Ct. at 1519). A state court's decision that applies the correct legal rule would not fit within the "contrary to" clause even if the federal court might have reached a different result relying on the same law. See Williams, 529 U.S. at 404-06, 120 S.Ct. at 1519-20 (O'Connor, J., concurring).
>
> . . . .
>
> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

9

> the state court identifies the correct
> governing legal principle from this Court's
> decisions but unreasonably applies that
> principle to the facts of the prisoner's
> case." <u>Williams</u>, 529 U.S. at 414, 120 S.Ct.
> at 1523 (O'Connor, J., concurring). In
> deciding this issue, the federal court should
> consider whether the state court's application
> of the law was objectively unreasonable and
> should not apply the subjective "all
> reasonable jurists" standard. <u>Id</u>. at 409-10,
> 120 S.Ct. at 1521-22. The Supreme Court
> recently adhered to its pronouncements in
> <u>Williams</u>, stating that "we stressed in
> <u>Williams</u> that an unreasonable application is
> different from an incorrect one." <u>Bell v.
> Cone</u>, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152
> L.Ed.2d 914 (2002). The Court further noted
> that "a federal habeas court may not issue a
> writ under the unreasonable application clause
> 'simply because that court concludes in its
> independent judgment that the relevant state-
> court decision applied clearly established
> federal law erroneously or incorrectly.'" <u>Id</u>.
> (quoting <u>Williams</u>, 529 U.S. at 411, 120 S.Ct.
> at 1522 (O'Connor, J., concurring)).

<u>Wellington v. Moore</u>, 314 F.3d 1256, 1260-61 (11th Cir. 2002).

The Eleventh Circuit has addressed the application of the
"contrary to" clause in reviewing a state court adjudication:

> In applying the "contrary to" prong of
> AEDPA, we have recognized that where no
> Supreme Court precedent is on point, "we
> cannot say that the state court's conclusion
> . . . is contrary to clearly established
> Federal law as determined by the U.S. Supreme
> Court." <u>McIntyre v. Williams</u>, 216 F.3d 1254,
> 1258 (11th Cir. 2000).

<u>Washington v. Crosby</u>, 324 F.3d 1263, 1265 (11th Cir.), <u>cert</u>.
<u>denied</u>, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine whether the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Furthermore, AEDPA "also directs that a presumption of correctness be afforded factual findings of state courts, which may be rebutted only by clear and convincing evidence. See id. at § 2254(e)(1). This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002), cert. denied, 538 U.S. 906 (2003). Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

11

## V. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel.  That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted).  In <u>Van Poyck</u>, 290 F.3d at 1322-23 (footnotes omitted), the Eleventh Circuit captured the essence of an ineffectiveness claim:

> [A] petitioner must show that his lawyer's performance fell below an "objective standard of reasonableness" and that the lawyer's deficient performance prejudiced the petitioner. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).  Establishing these two elements is not easy:  "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." <u>Waters v. Thomas</u>, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994)).
>
> For assessing a lawyer's performance, <u>Chandler v. United States</u>, 218 F.3d 1305 (11th Cir. 2000) (en banc) <u>cert</u>. <u>denied</u>, 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001), sets out the basic law: "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." <u>Id</u>. at 1314 (internal marks omitted). . . . Our role in reviewing an ineffective assistance claim is not to "grade" a lawyer's performance; instead, we determine only whether a lawyer's performance was within "the wide range of professionally competent assistance." <u>See</u> <u>Strickland</u>, 104 S.Ct. at 2066.

> The inquiry into whether a lawyer has provided effective assistance is an objective one:  a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take."  <u>See Chandler</u>, 218 F.3d at 1315. . . .

> A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high.  "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test."  <u>Strickland</u>, 104 S.Ct. at 2067. Instead, a petitioner must establish that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given adequate assistance.  <u>See id</u>. at 2068.[6]

In sum, "[w]ithout proof of both deficient performance and prejudice to the defense, . . . it could not be said that the sentence or conviction 'resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable,' and the sentence or conviction should stand." <u>Bell v. Cone</u>, 535 U.S. 685, 695 (2002) (internal citation omitted) (quoting <u>Strickland</u>, 466 U.S. at 687).

---

[6] However, "when a defendant raises the unusual claim that trial counsel, while efficacious in raising an issue, nonetheless failed to preserve it for appeal, the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." <u>Davis v. Sec'y for the Dep't of Corr.</u>, 341 F.3d 1310, 1316 (11th Cir. 2003) (per curiam) (citation omitted).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As ground one, Petitioner claims ineffective assistance of trial counsel for counsel's failure to properly investigate the case and interview or call witnesses at the trial. Petitioner raised this claim (as ground seven[7]) in his motion for post conviction relief in state court, and the trial court adjudicated the claim on the merits. After an evidentiary hearing, the trial court, in denying the claim, identified the two-pronged test established in <u>Strickland</u> and stated, in pertinent part:

> In Claim (7), Defendant contends that he provided counsel with the names and addresses of several witnesses, and that despite his requests, counsel refused to call them. Defendant contends that **witness [Aaron] Brunson** would have testified that he owns a business in the area of the crime and has previously called police to retrieve drugs and paraphernalia from in front of his business, and that Defendant was not bald and did not have a beard (that describes co-defendant Robinson), and so was not the person who actually gave cocaine to undercover officers. This testimony would be irrelevant to any matter regarding the time of the crime; not only did defense counsel garner admissions during cross-examination that the area had some paraphernalia laying about, but Defendant

---

[7] In his Rule 3.850 motion, Petitioner listed the witnesses: (1) Aaron Brunson; (2) Ann Robinson (co-defendant's wife); (3) Harriett Gather; (4) Tish Robinson; (5) Rochelle Thompson; (6) Investigator Blue, Public Defender's Office; (7) Officer Sandargo; (8) a fingerprint expert, Jacksonville Police Department; (9) Officer K.C., I.D. #5006, the booking officer; (10) Wilheimina Pinckney; and, (11) Ivory (Ivan Blanch; <u>see</u> Reply at 4). Ex. C at 30, 43, 98, 111.

was prosecuted as a principal to the actual sale. (Exhibit "B," pages 151-152, 218.) Defendant claims **witnesses [Ann] Robinson (co-defendant's wife) and Gather[8] (Defendant's alleged common-law wife)** would have testified to the same thing as Brunson, and that **a booking officer** could have testified that Defendant did not have a bald head or a beard. Defendant asserts that **witnesses Blue and Sandargo** would also have presented cumulative testimony regarding paraphernalia at the crime scene. Again, that testimony is irrelevant to Defendant's conviction as a principal. Moreover, **witness Gaither** apparently was supposed to have testified, but failed to appear. (Exhibit "B," page 289.)

Defendant claims that witnesses **Tish Robinson and Rochelle Thompson** would have testified that they saw police apprehend Defendant, and saw him throw down a hat and some keys. According to Defendant, this would somehow impeach the testimony of police officer Blispinghoff that no one else remained in the area when he later went back to retrieve cocaine discarded by Defendant. However, Defendant does not allege that these witnesses were present at this later point in time, nor does he indicate their availability for trial. Accordingly, he is not entitled to relief. *See* Highsmith v. State, 617 So.2d 825 (Fla. 1st DCA 1993). Defendant contends an unidentified **"fingerprint expert"** who, he claims tested the baggies seized by officers and found prints other than Defendant's. That testimony, however, would not demonstrate that Defendant did not possess the baggies, and clearly would not be relevant to his conviction as a principal to Sale or Delivery in any event.

Ex. C at 206-07 (emphasis added).

---

[8] While this witness's name has been spelled differently throughout the record, this Court hereinafter will refer to her as "Ms. Harriet Gaithers." Tr. at 251, 288-89, 313-14.

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order.  Accordingly, the claim was rejected on the merits by the state trial and appellate courts.   Thus, there are qualifying state court decisions.   This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.   The Court must next consider the "contrary to" and "unreasonable application" components of the statute.   "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide."  Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).

Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state courts' adjudications of the claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

The record reflects the following facts pertinent to this issue.   In support of this claim, Petitioner has submitted "counsel's notes," which reflect the following facts gathered in the investigative phase: Aaron Brunson states there were "a lot of

16

drugs on [the] lot" (Petitioner's Ex. A at 1); Brunson was listed
as a "possible witness" (id.); Petitioner stated that his fiancé
(Gaithers) did give a statement regarding the condition of the area
and other trash in the area (id. at 2); Petitioner "has names [and]
addresses of witnesses (not with him)" and Petitioner "wants photos
of area taken" (id. at 4); "Bronson's nephew (Ivan) saw them run –
'get rid of all of it' is what they're saying Pinkney said.  Tyrone
had the drugs.  Vernon knew it – let her have all of it [and] get
it out of my car." (id. at 5); January 6, 1997:  "Investigation
w[ith] Mr. Blue – could not locate any witnesses who saw the
incident." (id. at 6);  Ivan (Brunson's nephew) was listed as a
possible witness (id.), along with Shirley Lee who had said "nobody
was out there"; Petitioner told counsel that he had the following
witnesses:  Harriet Gaithers re[garding] keys, Tish Robinson, and
Aaron Brunson's nephew Ivan (id. at 8); telephone messages were
left for Harriet Gaithers, Tish Robinson and Aaron Brunson on
January 7 (id.); a telephone message was left for Tish Robinson on
January 10 (id.); a telephone call was made to Tish Robinson, but
there was no answer (Ex. A at 9); a telephone call was made to
Aaron Brunson, who said he had talked to four or five people and
"nobody saw anything" (id.); Aaron Brunson's nephew (Ivan) "only
saw after they were in [the] car" (id.); "Bottom-line – "no
witnesses for D[efendant] but cod[efendant]" (id.).

In further support of his claim before this Court, Petitioner submitted the unnotarized affidavit of Tish Robinson, who stated that she and Rochelle Thompson, on August 24, 1996, saw two police officers running after Petitioner. Petitioner's Ex. B. She stated that she would have testified to the following: she "was in the immediate vicinity of the chase" and "watched the complete chase"; Petitioner "did not drop a clear or vanilla baggie on the ground as he was being chased by the two officers"; "his black hat came off his head" as he was running, and he dropped his keys. Id. Rochelle Thompson, in an unnotarized affidavit, stated she would have testified to the same facts as Tish Robinson. Id.

Petitioner also submitted the unnotarized affidavit of Aaron Brunson, who stated that he was available to testify to the following: the crime occurred between 10:00 a.m. and 10:30 a.m., not 2:00 p.m.; there were people in the street near the crime scene; Tyrone Robinson was the individual with the bald head and hairy face that police had described as the one who had approached their unmarked car; and, Petitioner did not have a bald head at that time, but was clean shaven with only a mustache. Id.

Additionally, Petitioner, in the Third Amended Petition, states that Ivan Blanch (Aaron Brunson's nephew) was an eyewitness to the incident. See Third Amended Petition at 6. It is noteworthy that Petitioner did not mention Blanch's name in his Rule 3.850, and therefore the ineffectiveness claim with respect to

18

counsel's failure to call him was not addressed by the trial court. Petitioner cites to counsel's notes (Petitioner's Ex. A at 5) to support his contention that Blanch's testimony could have supported his story that he did not sell the drugs to the police.  However, counsel's notes reflect that the investigator for the Public Defender's Office contacted Mr. Brunson about his nephew, Ivan Blanch; the notes state that "his nephew only saw after they were in [the] car."  Id. at 9.

At the trial, Detective Leilani Martin testified that she and her partner Charles Porter, on August 24, 1996, were assigned to an undercover buy vehicle to pose as drug buyers in Marietta, Florida. Ex. A, Transcript of the Jury Trial (hereinafter Tr.) at 116-18. Detective Porter was driving the vehicle, and Detective Martin was in the passenger seat.  Id. at 122.  Detective Martin was in the "best position" to view the transaction since she was the one who actually did the drug transaction.  Id. at 161.

Detective Martin testified that, as she and her partner were driving in a northern direction, Petitioner yelled "what do ya'll need."  Id. at 120.  As she heard that phrase, she looked out the passenger window and observed two males.  Id.  While she was looking at the face of the first male, he repeated the phrase "what do ya'll need."  Id. at 120, 123.  She identified Petitioner in the courtroom as that individual.  Id. at 120, 145-46.  Detective Martin testified she "[d]efinitely could not have made a mistake"

19

on which of the two males stated "what do ya'll need" because she saw his mouth move when he said it the second time, and the first time she looked in his direction.  _Id_. at 152-53.

Detective Martin replied "30," which is street language for thirty dollars worth of cocaine.  _Id_. at 121.  She observed Petitioner walking towards her, as another black male followed behind him.  _Id_.  She noted that Petitioner was the "most visible" to her of the two black males who approached the vehicle.  _Id_. at 124.  She "looked out the window at [Petitioner]," as he positioned himself outside the side window.  _Id_. at 125.  When Petitioner first arrived at the window, he "leaned inside the window with his hands on the window and leaned in . . . ."  _Id_. at 126.  "He was leaning right in the window of the vehicle looking around."  _Id_. at 127.  The other male was not leaning into the car, but "was standing straight up" to the back of the front passenger door.  _Id_.

As a tactic to appear like an actual drug buyer, she then told him that she wanted to taste the cocaine to confirm it was real.  _Id_. at 128-29.  Petitioner then "instructed" the other black male to let her taste it.  _Id_. at 129.  The other black male said "okay" and then removed an object in a plastic bag that appeared to come from his mouth.  _Id_. at 130, 165.  He tried to break off a little portion, but Petitioner told him to give her the whole thing and let her taste it since she was okay; the other male followed the instructions.  _Id_. at 130.  Detective Martin pretended to taste the

cocaine.  Id. at 130-31.  As Petitioner reached his hand out for the money, the other male reached simultaneously, so she handed the other male the forty dollars[9] of marked U.S. currency; she then gave the predetermined code word to alert the backup units that the transaction had been completed.  Id. at 119, 131.

In order to keep them at the vehicle's window until backup units could arrive, she looked over to her partner and asked if he wanted to buy more drugs.  Id. at 131-32.  Petitioner was "hesitant," but he did look back into the vehicle as she was conversing with her partner regarding the possibility of buying more drugs.  Id. at 132.

Detective Martin stated she "spoke directly" to Petitioner and "[t]he narcotics purchase was arranged by [Petitioner] and he in turn encouraged the other male to hand [her] the drugs."  Id. at 132-34.  She never directly addressed the other male.  Id. at 133. She "completely spoke with [Petitioner] throughout the entire drug transaction."  Id. at 133-34.  "In fact, [Petitioner] lead the other individual through his conversation with [Detective Martin] to believe that he knew that [she] was okay and it was all right to deal drugs with [her]."  Id. at 134.

When the backup units arrived, both men ran in opposite directions.  Id. at 132.  The backup unit parked right behind

---

[9] As a tactic to stall Petitioner, she gave Petitioner forty dollars for thirty dollars worth of cocaine.  Tr. at 163.  She never got the ten dollars in change.  Id.

Detectives Porter and Martin's vehicle.  _Id_. at 135.  Petitioner ran behind Martin's vehicle and then in front of the backup unit's vehicle.  _Id_.  Detective Bisplinghoff and Officer Tuten chased Petitioner.  _Id_. at 134.  A few minutes later, the detectives returned with Petitioner in handcuffs and handed over to Detectives Porter and Martin "a little manila envelope which had a plastic baggie containing an off white rock-like substance . . . ."  _Id_. at 137.

Detective Porter testified that, as he was driving the vehicle, someone yelled "what ya'll need."  _Id_. at 171.  He pulled over to the side of the road, and observed the man again say "what ya'll need."  _Id_. at 171-72.  He identified Petitioner in the courtroom as the man who said "what ya'll need."  _Id_. at 172.

Detective Bisplinghoff testified that he drove an unmarked backup vehicle that arrived on the scene approximately ten seconds after the predetermined code word was given.  _Id_. at 205, 207.  As he arrived on the scene, he saw two black males standing outside the passenger window of the buy car.  _Id_. at 208.  As he eased up approximately ten feet behind the buy car, he observed Petitioner, who had turned and looked at his vehicle.  _Id_. st 208, 213.  Then, Petitioner ran and cut between the back of the buy vehicle and the backup unit.  _Id_. at 209, 216.  Detective Bisplinghoff saw Petitioner throw down a clear baggie.  _Id_. at 210.  After a 100

yard chase, Detective Bisplinghoff caught him and turned him over to the other detectives.  Id. at 211-12.

Apprehending Petitioner was his "number one goal," and retrieving the item Petitioner had discarded was his "number two goal."  Id. at 223-24.  He then "went directly back to the spot where [he] saw [Petitioner] discard the baggie."  Id. at 211, 215.  Detective Bisplinghoff agreed that the location at McCargo and Driggers Streets is a high drug crime area, but noted that "[i]t's not unusual to find bags with cocaine residue in them [on the ground in the fields at McCargo and Driggers Street] but bags that contain cocaine[,] it's unusual."  Id. at 217, 218.

Detective Tuten was riding in the back seat of Detective Bisplinghoff's backup unit.  Id. at 227.  As Detective Bisplinghoff chased and apprehended Petitioner, Detective Tuten followed.  Id.  During the chase, he saw Petitioner "go into his pocket and pull out a package and throw it on to the ground."  Id. at 228.  While continuing to pursue, he "yelled to Officer Bisplinghoff that [Petitioner] just threw it down . . . ."  Id.  Approximately thirty seconds to one minute after the apprehension of Petitioner, Detective Bisplinghoff retrieved the package that was thrown down by Petitioner.  Id.  During the chase, Detective Tuten saw Petitioner's keys and noticed that Petitioner's hat came off while he was running.  Id. at 231, 232.

Tyrone Gerard Robinson, the co-defendant, testified at the trial for the defense, stating he is Petitioner's ex-brother-in-law since Petitioner had been married to Robinson's sister. Id. at 253. He testified that Petitioner was not aware that he had a rock of cocaine in his mouth on August 24, 1996. Id. at 254-55. He stated that a lady and a gentleman drove up, and "she was hanging out the window asking about a 40 . . . ." Id. at 259. He testified that he approached the car, looked into the car and gave her the rock out of his mouth. Id. at 259-60. He does not recall Petitioner saying anything. Id. at 261.

Robinson affirmed that it is common to go out in the fields at McCargo and Driggers Streets and find baggies of crack cocaine because it is a known drug area. Id. at 262. He has found baggies of cocaine "all the time" because he does yard work to keep that area clean. Id. at 253, 262, 278. He has found baggies of residue as well as actual powder cocaine and rocks of cocaine. Id. at 262. Robinson concluded that he was the only one who sold the cocaine to the officers; he did the deal, not Petitioner. Id. at 263-64, 285-86.

Petitioner testified on his own behalf, stating that Robinson sold the cocaine at the passenger window, while he stayed to the rear of the car. Id. at 298. He described the transaction as follows:

> As they came up the lady that was up here
> she was yelling out of the window. She was

yelling about a 40 . . . .   Seem like Tyrone mumbled something to me.  I don't know if he did but at the time she yelled the 40 he took and walked up to the car where she was, and he mentioned about he had one and sold it to her.

. . . .

At the time Tyrone walked up to the car I kept walking to the back of the car.  I never did go to that car window where those people was.  I never did.  I walked to the rear of the car.  Tyrone went to the car.  Tyrone was there talking to the lady in the car.  I stood to the rear of the car.

When I heard Tyrone and her talking about the 40 what I heard was Tyrone saying where is the rest of my money, where is the rest of my money.  I turned and looked over my shoulder when I seen Tyrone and her fumbling with something.  He had a little something in his hand and she was trying to get out of his hand.  He had something.  She was trying to get it out of his hand.

He was trying to hold onto it, and I never did see exactly what it was but as I looked over my shoulder I knew something wasn't going right, that there was something going on wrong.

. . . .

At the time she mentioned something about give her the whole thing, give it to her, and at the time I told Tyrone – I mentioned whatever that is, whatever that is give her all of that shit because you are not going with me.  You are not getting in the car with me because I had realized Tyrone was doing something that he wasn't supposed to have been doing.

. . . .

I started to walk off.  I started to run off really because at the time that Tyrone --

25

when I seen what Tyrone was doing, that he was committing a crime, when I started to run off this car came to the corner.

As the car was coming to the corner I didn't run. I started walking off. As I walked on off this car drove on up behind the little car that they was in, and at the time they drove up first thing hit my mind was that this was a lady in the car that Tyrone was talking to. I never did even look down at the car.

I heard the statement up here this morning but I never looked in the car. I didn't even know that there was a man in the car. I thought it was two ladies in the car. I thought really the car that came up behind them I thought it was maybe the old man is what I thought.

. . . .

Well, I ran because I felt like something wasn't going on right and I did not want anybody to really see me with whatever Tyrone was doing, and I ran because I know he was doing something wrong. I didn't want no parts of it.

. . . .

I didn't throw anything down, sir. When I was running I had my girlfriend['s] car keys. Her car is what I was driving. I had her car keys and I didn't have them in my pocket. I had them stuck in my belt. I had a shirt that hung down over my belt around my waist like, and as I was running I pulled the keys out because they was hitting my leg as I took off to run.

I pulled them out, and as I started running I don't remember even dropping them but I dropped them as I was running.

. . . .

26

> I ran into a field.  As I took off to run
> I ran into the corner.  I turned left.  I
> turned right and a car was coming towards me.
> As the car was coming towards me I turned and
> ran over to a field.  As I run over into a
> field I actually -- I actually came to my
> senses like why the hell am I running.  I
> didn't do anything.
>
> I stopped running for two reasons.  I
> stopped running because I didn't do anything.
> I didn't have nothing to do with what Tyrone
> was doing, and I recognized that I had dropped
> my car keys.  That's the reason I stopped
> running.

Id. at 298-301.

At the trial, Mr. Hernandez (Petitioner's trial counsel) notified the trial judge that he intended to call Ms. Harriet Gaithers as a witness for the defense.  Id. at 251, 288-89, 313-14. He stated that she was under subpoena to appear and that he had directed her to be back in the courtroom by three o'clock that afternoon.  Id. at 313.  Defense counsel requested a continuance until the next day to allow time for the witness to appear to testify on Petitioner's behalf.  Id.  The trial judge inquired as to the substance of her testimony.  Id. at 313-14.  Defense counsel stated that "it would be to the area having common -- just the area basically having cocaine bags on the ground . . . ."  Id. at 314. The trial judge denied the motion for a continuance, noting that

her testimony would be cumulative since there was already testimony on the issue.[10]  Id.

The State called Detective Bisplinghoff as a rebuttal witness, who affirmed that there was no debris in the area where he retrieved the cocaine that Petitioner dropped.  Id. at 317. Detective Bisplinghoff confirmed that he was one hundred per cent confident "without a doubt" that Petitioner dropped the cocaine. Id.

During the jury deliberation, the jury had five questions,[11] one pertaining to a play back of Detective Tuten's testimony concerning seeing Petitioner's dropping of the bags.  Id. at 378. Defense counsel requested that Detective Tuten's testimony be read back in its entirety since his testimony was brief, and the State and trial judge agreed.  Id. at 380-81, 384.  Detective Tuten's testimony was read.[12]  Id. at 384.  The jury found Petitioner guilty of sale of cocaine and possession of cocaine.  Id. at 386.

_____

[10] As previously noted, Detective Bisplinghoff affirmed that the field at McCargo and Driggers streets is a high drug crime area, noting that it is not unusual to find baggies with cocaine residue in them, but finding baggies containing cocaine is unusual. Tr. at 217, 218.  However, defense witness Tyrone Robinson testified regarding his finding baggies of actual cocaine powder and rocks in the field at McCargo and Driggers streets since it is a known drug area.  Id. at 262, 278.  Thus, as correctly stated by the trial judge with respect to Ms. Gaithers, any additional testimony with respect to this issue would have been cumulative.

[11] See Tr. at 378-84.

[12] See also Tr. at 225-34.

Petitioner's ineffectiveness claim for counsels' failure to properly investigate the case and interview or call witnesses at the trial is without merit.  In evaluating the performance prong of the _Strickland_ ineffectiveness inquiry, there is a strong presumption in favor of competence.  Thus, Petitioner must establish that no competent attorney would have taken the action that counsel, here, chose.  _United States v. Freixas_, 332 F.3d 1314, 1319-20 (11th Cir. 2003) (citations omitted).  Given defense counsels' actions based on the record before this Court, defense counsels' performance was not deficient.

The trial transcript reflects that counsel brought before the jury the pertinent facts of Petitioner's defense.  Petitioner's defense was that he was _not_ the individual who sold the cocaine to Detective Martin (but rather that Tyrone Robinson was the only one involved in the sale of the cocaine and was the one who approached the buy vehicle) and that Petitioner did not drop a baggie of cocaine in the field, but rather just a black hat and keys, as he was being chased by Detective Bisplinghoff.  Petitioner states that Ms. Harriet Gaithers would have testified that he had called her to inform her that he lost her car keys (that were in his possession) and his black hat during the chase; however, Petitioner explained at the trial the loss of the car keys (_id_. at 300-01), and Detective Tuten testified he saw Petitioner's keys.  _Id_. at 231. Therefore, the jury was well-informed that Petitioner lost his

girlfriend's car keys during the chase.   And, with respect to his black hat, Detective Tuten acknowledged that Petitioner's hat came off during the chase.    <u>Id</u>. at 232.    Additionally, during Petitioner's testimony, he described his noninvolvement in the criminal activity on that day and explained why he initially fled from the officers and why he eventually stopped running.

Further, counsel's failure to call witnesses to testify that Petitioner was not bald and had no beard on August 24, 1996, was not ineffective.   Petitioner, during his own testimony, clearly stated that the officers "were confused" with respect to identifying him as the individual who approached the car to conduct the transaction.   <u>Id</u>. at 303.   When Tyrone Robinson testified, he described himself as having a full beard and no mustache on that day and being significantly taller than Petitioner by approximately five inches.   <u>Id</u>. at 276.   Further, when the detectives identified Petitioner as the one who approached the buy car to conduct the transaction, they identified him by sight and memory with no description of physical attributes.

At the evidentiary hearing which addressed this issue, Ms. Debra Billard (Petitioner's attorney from October 1, 1996, until January 1997, which was before the trial in March 1997) testified that she or her investigator (Mr. Blue) spoke to every potential witness supplied by Petitioner.   EH Tr. at 80.   She estimated that there were about ten to twelve witnesses that they contacted and

30

interviewed. Id.    Additionally, Mr. Hernandez (Petitioner's trial attorney), at the evidentiary hearing, testified that he got several names from Petitioner, and he called and interviewed them. Id. at 103.

Even assuming *arguendo* deficient performance by defense counsel, Petitioner has not shown prejudice.  Under the prejudice prong of the inquiry, Petitioner "must affirmatively prove prejudice by showing that counsel's errors actually had an adverse effect on the defense." United States v. Freixas, 332 F.3d at 1320 (quotation omitted).   This showing requires "more than some conceivable effect on the outcome of the proceeding." Id. (quotation omitted).    Here, Petitioner has not shown that a reasonable probability exists that the outcome of the case would have been different if his lawyers had given the assistance that Petitioner has alleged he should have provided.    This ineffectiveness claim is without merit.

### B. Ground Two

As ground two, Petitioner claims ineffective assistance of trial counsel for failure to request a mistrial during the prosecutor's closing argument.  Petitioner raised this claim (as ground one) in his motion for post conviction relief in state court, and the trial court adjudicated the claim on the merits. Although an evidentiary hearing was conducted, this issue was not addressed.  In denying the claim, the trial court identified the

31

two-pronged test established in <u>Strickland</u> and stated, in pertinent part:

> In Claim (1), Defendant contends that counsel should have properly objected and moved for mistrial during the State's closing argument.  According to Defendant, the State commented on facts not in evidence on two occasions, resulting in sustained defense objections.  The transcript corroborates this (Exhibit "B," pages 346-347, 353.)  Defendant asserts that his attorney failed to move for a mistrial after the first such comment. However, the first comment was not so inflammatory or prejudicial as to warrant a mistrial. <u>Jones v. State</u>, 652 So.2d 346 (Fla. 1995); <u>Burr v. State</u>, 466 So.2d 1051, 1054 (Fla. 1985), <u>cert</u>. <u>denied</u>, 474 U.S. 879, 106 S.Ct. 201, 88 L.Ed.2d 170 (1985).  Further, not only was the first comment far less significant than the second, but counsel *did* request a mistrial after the second comment, which request was denied.  There is no reasonable probability, then, that a similar request would have been granted with respect to the first comment.

Ex. C at 203.

The first comment about which Petitioner complains is as follows.  The prosecutor, during closing argument, stated:

> Ladies and gentlemen, that is principal. Now maybe the defendant thought he was pretty darn smart.  You know, I get this guy [Tyrone Robinson].  He has got a crack habit.  You know, I can give him a ride.  He makes sales for me.  I will give him a ride now and again I -- and I don't actually make the transaction so I don't -- I can't get prosecuted.

Tr. at 346.  Defense counsel objected, stating "[t]here has been no evidence that came out at this point." <u>Id</u>. at 347.  The trial judge sustained the objection and warned the prosecutor to

"[c]onfine [himself] to commenting on the evidence that came out at

trial . . . ." <u>Id</u>.  A short while later, the prosecutor stated:

> He thought he was smart enough to get by
> this, and we have got the principal law and he
> is not going to be able to get around that.
> We have the law for people just like him, the
> ones who are the shakers and the movers,
> people behind the scenes, the people that put
> people who are hooked on crack like Mr.
> Robinson up to things --

<u>Id</u>. at 352-53.

Defense counsel objected, and the following colloquy occurred

outside the presence of the jury.

> [PROSECUTOR]: This is argument and it's
> based on facts.
>
> [DEFENSE COUNSEL]: I understand it's
> argument but no evidence as far as being
> hooked.
>
> THE COURT: What facts do you have about
> people hooked?
>
> [DEFENSE COUNSEL]: And it's improper
> argument.
>
> . . . .
>
> [DEFENSE COUNSEL]: **And I ask for a
> mistrial as this time.**
>
> [PROSECUTOR]: This is going for the all
> time record for mistrials.
>
> [DEFENSE COUNSEL]: It's my first case in
> a year.
>
> [PROSECUTOR]: This individual [Tyrone
> Robinson] stated that he was selling drugs
> because -- so he could get two hits instead of
> one.  Obviously shows a crack habit and he was

33

working to try to get crack cocaine.  He said that himself on the stand.

THE COURT: That's not what your comment was.

[PROSECUTOR]: You get somebody who is hard up for crack cocaine and get him to make the sale and provide him with more and you have additional cocaine on him.

THE COURT: Go back to this last comment.

(The last statement was read back.)

[PROSECUTOR]: That's the whole case.  He is the principal to this whole thing.

THE COURT: There wasn't testimony Mr. Robinson is hooked on crack cocaine or any other people are hooked.

[PROSECUTOR]: He himself stated only reason he did it so he could get two rocks instead of one because he had a habit.[13]

[ANOTHER PROSECUTOR]: He did say that.

THE COURT: He said he wanted two.  Didn't say anything about a habit.  There is no testimony about other people who are hooked on crack cocaine, and that is certainly irrelevant to the facts in this particular case.  I will deny your motion for mistrial.

. . . .

THE COURT: You may continue, Mr. Pajcic.

Id. at 353-55 (emphasis added).

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order.  Accordingly,

---

[13] Tyrone Robinson testified that "I had a habit myself and that would buy two [rocks]."  Tr. at 261.

the claim was rejected on the merits by the state trial and appellate courts.  Thus, there are qualifying state court decisions.  This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.  The Court must next consider the "contrary to" and "unreasonable application" components of the statute.  "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide."  Brown v. Head, 272 F.3d at 1313.

Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state courts' adjudications of the claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In sum, Petitioner ineffectiveness claim for counsel's failure to request a mistrial after the first comment is without merit. There is a strong presumption in favor of competence.  Petitioner must establish that no competent attorney would have taken the action that counsel, here, chose.  Given defense counsel's actions based on the record before this Court, defense counsel's performance was not deficient.

Even assuming *arguendo* deficient performance by defense counsel, Petitioner has not shown prejudice. Petitioner has not shown that counsel's errors actually had an adverse effect on the defense. Here, Petitioner has not shown that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given the assistance that Petitioner has alleged he should have provided. This ineffectiveness claim is without merit. <u>See</u> Response at 9-11.

## C. Ground Three

As ground three, Petitioner claims the trial court erred in denying his motions for mistrial on four separate occasions.[14] Respondents assert that this claim was not properly presented in state court and is now procedurally barred. <u>See</u> Response at 11-13. However, Petitioner raised the following issue on direct appeal: the trial court reversibly erred in denying Petitioner's motion for mistrial when the State harmfully commented on facts not in evidence during its closing argument. Ex. B. In reviewing the Initial Brief of Appellant on direct appeal (<u>see</u> <u>id</u>.), it is clear that Petitioner raised only the fourth instance, in which the trial court denied defense counsel's motion for mistrial. <u>See</u> Tr. at 352-55. Therefore, this Court concludes that Petitioner sufficiently raised the issue concerning the trial court's denial

---

[14] The trial court denied defense counsel's motions for mistrial on four separate occasions. <u>See</u> Tr. at 264-67, 273-76, 307-10, 352-55.

of the fourth motion for mistrial.  However, with respect to the trial court's denial of the first, second and third motions for mistrial, Petitioner should have raised the claim on direct appeal, but failed to do so.

A petition for writ of habeas corpus should not be entertained unless the petitioner has first exhausted his state remedies.  See Castille v. Peoples, 489 U.S. 346, 349, reh'q denied, 490 U.S. 1076 (1989); Rose v. Lundy, 455 U.S. 509 (1982).  "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  Turner v. Crosby, 339 F.3d 1247, 1281 (11th Cir. 2003), cert. denied, 124 S.Ct 2104 (2004) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999)).  "This exhaustion doctrine 'is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts.'"  Turner, 339 F.3d at 1281 (quoting O'Sullivan, 526 U.S. at 845).

Generally, a federal habeas petition should be dismissed if the petitioner has failed to exhaust state remedies.  See Keeney v. Tamayo-Reyes, 504 U.S. 1, 10 (1992).  A federal court need not dismiss the petition to allow for exhaustion of state remedies, however, if such a dismissal would be futile.

> [I]f the petitioner simply never raised a
> claim in state court, and it is obvious that
> the unexhausted claim would now be
> procedurally barred due to a state-law

37

> procedural default, the federal court may
> foreclose the petitioner's filing in state
> court; the exhaustion requirement and
> procedural default principles combine to
> mandate dismissal.

Bailey v. Nagle, 172 F.3d 1299, 1303 (11th Cir. 1999) (per curiam)
(citing Snowden v. Singletary, 135 F.3d 732, 737 (11th Cir.), cert.
denied, 525 U.S. 963 (1998)).

Here, Petitioner could have and should have raised this claim
on direct appeal.  It would be futile to dismiss this case to give
him the opportunity to exhaust this claim on direct appeal.  Thus,
Petitioner has procedurally defaulted this claim.

"Procedural defaults in state courts will foreclose federal
court review, absent a showing of cause and prejudice."  Parker v.
Sec'y for the Dep't of Corr., 331 F.3d 764, 770 (11th Cir. 2003)
(citing Wainwright v. Sykes, 433 U.S. 72 (1977)), cert. denied, 124
S.Ct. 1513 (2004).  "[A] petitioner may gain federal review of an
otherwise procedurally defaulted claim if he can demonstrate both
cause excusing the default and actual prejudice resulting from the
bar."  Hill v. Jones, 81 F.3d 1015, 1022-23 (11th Cir. 1996)
(citations omitted), cert. denied, 519 U.S. 1119 (1997).

"[A] federal court may also grant a habeas petition on a
procedurally defaulted claim, without a showing of cause or
prejudice, to correct a fundamental miscarriage of justice."
Fortenberry v. Haley, 297 F.3d 1213, 1222 (11th Cir. 2002) (per
curiam) (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)),

38

cert. denied, 538 U.S. 947 (2003).  "In order to show the type of 'miscarriage of justice' that will excuse a procedural bar, a petitioner must make a colorable showing of actual innocence." Crawford v. Head, 311 F.3d 1288, 1327 (11th Cir. 2002) (citations omitted), cert. denied, 124 S.Ct. 408 (2003).  The actual innocence exception is "exceedingly narrow in scope" and requires proof of factual innocence, not mere legal insufficiency.  Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted), cert. denied, 535 U.S. 926 (2002); Sawyer v. Holder, 326 F.3d 1363, 1367 (11th Cir.), cert. denied, 124 S.Ct. 258 (2003).  "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson, 256 F.3d at 1171 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).  Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Id. (citation omitted) (quoting Schlup, 513 U.S. at 324) (explaining that "[g]iven the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected."). Here, Petitioner has not shown both cause excusing the default and actual prejudice resulting from the bar.  Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception.  For these reasons, the Court need not review the merits of Petitioner's

trial court error claim with respect to the first, second and third motions for mistrial.

As noted previously, Petitioner claimed on direct appeal that the trial court erred in denying his motion for mistrial based on the prosecutor's comment concerning "people that put people who are hooked on crack like Mr. Robinson up to things."  The appellate court affirmed Petitioner's judgment of conviction.  Thus, this claim was addressed on the merits by the state appellate court.[15] Accordingly, there is a qualifying state court decision.  Having found that the state court determination is a qualifying decision, the Court must next consider the "contrary to" and "unreasonable application" components of the statute.  "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide."  Brown v. Head, 272 F.3d at 1313.

Accordingly, the decision of the state appellate court involved a reasonable application of clearly established federal law, as determined by the United States Supreme Court.  Petitioner is not entitled to relief on the basis of this claim because the state appellate court's decision was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based

---

[15] As previously noted, for a state court's resolution of a claim to be an adjudication on the merits, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling.  Wright, 278 F.3d at 1255.

on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## D. Ground Four

As ground four, Petitioner claims ineffective assistance of trial counsel due to a conflict of interest since counsel (Lois Ragsdale and Debra Billard) represented Petitioner and co-defendant Tyrone Robinson during the pretrial stage. Petitioner raised this claim (as ground fourteen) in his motion for post conviction relief in state court, and the trial court adjudicated the claim on the merits. After an evidentiary hearing was conducted, the trial court, in denying the motion for post conviction relief, identified the two-pronged test established in Strickland and stated, in pertinent part:

> In Claim (14), Defendant contends that his second attorney[16], Billard, labored under a conflict of interest because she represented both Defendant and co-defendant Robinson until Robinson entered a plea agreement with the State, and gave more favorable treatment to Robinson including preventing Robinson from giving exculpatory testimony on behalf of Defendant. According to Defendant, she was also at the same time being investigated for substance abuse. As discussed at the evidentiary hearing, Robinson did, in fact, attempt to exonerate Defendant at trial; the jury apparently disbelieved him.

---

[16] Petitioner was represented by Ms. Lois Ragsdale for about one month (August 28, 1996, to September 24, 1996), then Ms. Debra Billard for about three months (October 1996 through January 13, 1997), and finally Mr. Hernandez at the jury trial in March 1997. EH Tr. at 18, 32, 47, 59-60. Mr. Hernandez represented only Petitioner. Id. at 28.

> Initially, Defendant cannot show prejudice to his *trial* since Billard was not his trial attorney and Robinson testified favorably to him. He further appears to be arguing that he was prejudiced by the fact that he had to go to trial at all, *i.e.,* Billard prejudiced him by obtaining a plea bargain for Robinson instead of for Defendant (to testify against Robinson). As discussed *supra*, Defendant indicated he would, and in fact did, reject any plea offer which resulted in conviction due to his status as a South Carolina homicide parolee. Further, since the testimony adduced at the hearing indicated that Robinson had at all times represented his intent to admit sole guilt in regards to the instant offenses, and further honored this commitment by attempting to exonerate Defendant, any "conflict" cannot be said to have resulted in prejudice. As to Defendant's claim about substance abuse, he fails to allege that the "investigation" of Billard disclosed any actual abuse, or that such prejudiced his case, and presented no evidence to support this claim whatsoever.

Ex. C at 208-09.

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order. Accordingly, the claim was rejected on the merits by the state trial and appellate courts. Thus, there are qualifying state court decisions. This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA. The Court must next consider the "contrary to" and "unreasonable application" components of the statute. "It is the objective reasonableness, not the correctness

42

per se, of the state court decision that we are to decide." Brown
v. Head, 272 F.3d at 1313.

Upon a thorough review of the record and the applicable law,
it is clear that Petitioner is not entitled to relief on the basis
of this claim because the state courts' adjudications of the claim
were not contrary to clearly established federal law, did not
involve an unreasonable application of clearly established federal
law, and were not based on an unreasonable determination of the
facts in light of the evidence presented in the state court
proceedings.

As previously noted, an evidentiary hearing was conducted, and
this issue was addressed.  At the evidentiary hearing, Ms. Lois
Ragsdale (Petitioner's first attorney) testified:

> As I stated before, I don't have any
> independent recollection of this case.  I am
> referring at this time to my notes which I
> made during my conversations with Mr. Pinkney,
> which stated specifically, "Codefendant
> willing to give statement exonerating
> defendant," as well as the statement he gave
> to the interviewer, "Codefendant would make
> statements stating it was not his," meaning it
> was not Mr. Pinkney's.
>
> . . . .
>
> In general, though, whenever a potential
> conflict came into our office, it was my
> practice to ask them whether or not there
> would be a conflict, especially when Mr.
> Pinkney was in jail and Mr. Robinson was out
> of jail.  Obviously Mr. Pinkney is going to be
> the first person I talk to because he is
> easily accessible at that point.  And I would
> have asked him at that time if he thought

there would be a conflict.  That was just my
normal habit of practice, and which I assume
is why I have the response on here in my
notes, "Per defendant, codefendant willing to
give statement exonerating defendant."

. . . .

On September 10th -- I must assume it was
his initial date in court -- I had the state
offer an adjudication of guilty and six
months, which I would have relayed to him.

Immediately after that notation is
information regarding bond information which,
I would presume at this time in looking at my
notes, is that he was rejecting the state
offer, didn't want to take it, and he wanted
me to file a motion for reduction of bond.
And it's my understanding from looking at the
notes that that was done.

. . . .

I had the case for less than one month, less
than 30 days, during which time I met with Mr.
Pinkney on --  I'm  having three different
occasions and spoke to him regarding the
charges, relayed to him what the state offers
were, and at that point Tyrone was still out.
I'm not sure.  I don't have Tyrone's file.  I
cannot refer to my notes in there, and I
don't' know if flipping was an issue yet.

Obviously, if flipping arose after my
representation ended, maybe there was a
conflict.  During the less than 30 days I had
the file, there was no conflict.

EH Tr. at 63-64, 65, 69.

In October of 1996, after Ms. Ragsdale's withdrawal as counsel
due to her departure to another legal office, Ms. Debra Billard
represented Petitioner.  Id. at 76.  At the evidentiary hearing,
she stated:

44

> I believe when I took over the case she [Lois Ragsdale] had represented both of them at arraignment and had both of the cases for about a month and did not feel that there was a conflict and nor did I.
>
> . . . .
>
> It was my understanding that Tyrone Robinson admitted his guilt and was willing to plead and was willing to testify on Mr. Pinkney's behalf.
>
> . . . .
>
> I think there had been originally a six-month offer, and then at some point I believe the state realized about his prior record and prepared guidelines and the offer had gone up, and I think that all happened when she had the case, but I can --

Id. at 77, 78.

Ms. Billard testified that Petitioner never objected to her representation of both him and his co-defendant.  Id. at 81.  She noted that, if he had objected to the dual representation, she probably would have discussed it with one of her office supervisors and possibly filed a certificate of conflict and motion to withdraw.  Id. at 82.  She further testified:

> There didn't appear to be a conflict.  I did finally file a certificate of conflict and move to withdraw from Mr. Pinkney's case, but it wasn't because of Mr. Robinson.  It was a personal issue between Mr. Pinkney and myself.[17]

---

[17] See Petitioner's Ex. E (Transcript of a Pretrial Proceeding, dated January 13, 1997) at 27; Petitioner's Ex. F (Letter by Ms. Debra Billard explaining the reasons she moved to withdraw from her representation of Petitioner).

> . . . .
>
> No, it wasn't a case of the two of them
> pointing the finger at each other.  It was a
> case of Mr. Robinson saying I'm guilty, I
> admit it, and I'll be happy to testify on
> Vernon's behalf.
>
> . . . .
>
> I remember discussing it [conflict] with
> other people and coming to the conclusion that
> there was none.  I remember discussing it with
> other attorneys in my office and picking up
> the case from Ms. Ragsdale, who made the
> determination that there was not.

Id. at 82, 83, 92.  Specifically, she conferred with senior

attorneys in her office, on October 30, 1996, and they agreed that

there was no conflict.  Id. at 95-96, 99.

Mr. James Hernandez took over the representation of Petitioner

in February of 1997, and Tyrone Robinson had already entered a

guilty plea.  Id. at 101, 103.  Mr. Hernandez did not represent

Tyrone Robinson.  Id. at 103.  Mr. Hernandez testified at the

evidentiary hearing, stating that he pursued a misidentification

defense and that Petitioner never mentioned any conflict of

interest by the Public Defender's Office in defending him and

Robinson together.  Id. at 104.

There is a strong presumption in favor of competence.

Petitioner must establish that no competent attorney would have

taken the action that counsel, here, chose.  Given defense

counsels' actions based on the record before this Court, defense

counsels' performance was not deficient.

Even assuming *arguendo* deficient performance (laboring under
a conflict of interest) by defense counsel, Petitioner has not
shown prejudice.   Petitioner has not shown that a reasonable
probability exists that the outcome of the case would have been
different if his lawyers had given the assistance that Petitioner
has alleged they should have provided.   This ineffectiveness claim
is without merit.   <u>See</u> Response at 18-19.

### E. Ground Five

As ground five, Petitioner claims ineffective assistance of
trial counsel for failure to advise him of the disadvantages of
waiving his speedy trial rights and his right to obtain counsel.
Petitioner contends that counsel's (Ms. Billard) failure to advise
him when he signed the "Waiver of Speedy Trial" (Petitioner's Ex.
J, dated January 13, 1997) in order to obtain counsel (Mr.
Hernandez) was ineffective.   <u>See</u> Third Amended Petition at 51;
Reply at 16-18.

Respondents contend, and this Court agrees, that Petitioner
did not exhaust this ineffectiveness claim in state court.
Response at 20.   While he raised numerous ineffectiveness claims in
his Rule 3.850 motion (Ex. C), he failed to raise this issue.
Generally, a federal habeas petition should be dismissed if the
petitioner has failed to exhaust state remedies.   <u>See</u> <u>Keeney v.
Tamayo-Reyes</u>, 504 U.S. at 10.   A federal court need not dismiss the

petition to allow for exhaustion of state remedies, however, if such a dismissal would be futile.

It would be futile for this Court to dismiss this case to give Petitioner the opportunity to present his unexhausted claim to the state courts because second or successive 3.850 motions are subject to dismissal if the court finds that the motion "fails to allege new or different grounds for relief and the prior determination was on the merits" or the court finds that the failure of the movant to assert new and different grounds in a prior motion constitutes an abuse of procedure. Fla. R. Crim. P. 3.850(f). Furthermore, any 3.850 motion that Petitioner filed at this time would be subject to dismissal as untimely. See Fla. R. Crim. P. 3.850(b). Thus, Petitioner's unexhausted claim has been procedurally defaulted. See Bailey, 172 F.3d at 1305.

Here, Petitioner has not shown cause and prejudice or that he falls within the fundamental miscarriage of justice exception. See Section C., Ground Three. Thus, his claim under ground five is procedurally barred. For this reason, the Court need not review the merits of the claim.[18]

_____

[18] Even assuming that procedural default is not applicable, the claim is without merit. See Response at 21-23; Petitioner's Ex. E (Transcript of a Pretrial Proceeding, dated January 13, 1997) at 28-32; Petitioner's Ex. J, Waiver of Speedy Trial, dated January 13, 1997.

## F. Ground Six

Petitioner claims ineffective assistance of trial counsel for failure to raise or preserve his Batson[19] claim.  Petitioner raised this claim (as ground thirteen) in his motion for post conviction relief in state court, and the trial court adjudicated the claim on

---

[19] The test for determining the propriety of a challenge to a juror when there is an allegation that the challenge was based upon race was established in Batson v. Kentucky, 476 U.S. 79 (1986). The Supreme Court further explained this test in Purkett v. Elem, 514 U.S. 765, reh'g denied, 515 U.S. 1170 (1995):

> Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2).  If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful discrimination.  Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1865-1866, 114 L.Ed.2d 395 (1991)(plurality opinion); id., at 375, 111 S.Ct., at 1874 (O'CONNOR, J., concurring in judgment); Batson, supra, at 96-98, 106 S.Ct., at 1722-1723.  The second step of this process does not demand an explanation that is persuasive, or even plausible.  "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  Hernandez, 500 U.S., at 360, 111 S.Ct., at 1866 (plurality opinion); id., at 374, 111 S.Ct., at 1874 (O'CONNOR, J., concurring in judgment).

Id. at 767-68; see McNair v. Campbell, 416 F.3d 1291, 1310 (11th Cir. 2005).

the merits.   Although an evidentiary hearing was conducted, this particular issue was not addressed.   In denying the claim, the trial court identified the two-pronged test established in Strickland and stated, in pertinent part:

> In Claims (8) and (13), Defendant contends counsel should have objected to the composition of the jury.   These claims are facially insufficient; the claim of an "unfair cross-section" is not statistically supported, it suggests no basis for objection other than the racial composition of the jury, and does not suggest any juror was either biased or stricken on a racial or other impermissible basis.   "[J]uries are not required to mirror the community in a manner that reflects the racial composition of the community: Parties are only constitutionally entitled to the assurance that peremptory challenges will not be exercised so as to exclude members of discrete racial groups solely by virtue of their affiliation."   Bryant v. State, 565 So.2d 1298 (Fla. 1990).   Further, even Defendant cites to portions of the record where counsel did, in fact, object to racial strikes and the objection was overruled.   Such claims thus could and should have been raised on direct appeal.

Ex. C at 207.

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order.   Accordingly, the claim (ineffectiveness of counsel for failure to "raise" or object to the Batson claim during voir dire)[20] was rejected on the

---

[20] The trial court, however, did not specifically address the portion of Petitioner's ineffectiveness argument concerning counsel's alleged failure to preserve the Batson issue for appeal.

merits by the state trial and appellate courts.  Thus, there are qualifying state court decisions.  This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.

Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state courts' adjudications of the claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

However, the trial court did not address the portion of Petitioner's ineffectiveness claim concerning trial counsel's failure to preserve the <u>Batson</u> claim for appeal (to renew the <u>Batson</u> claim before accepting the jury).[21]  There is a strong presumption in favor of competence, and Petitioner must establish that no competent attorney would have taken the action that

---

[21] "Under Florida law, simply objecting to the state's possibly discriminatory strikes, and then countering any purportedly race-neutral explanation given by the prosecution, does not suffice to preserve a *Batson* claim for appeal.  Rather, trial counsel must press the already rejected challenge a second time at the conclusion of voir dire, either by expressly renewing the objection or by accepting the jury pursuant to a reservation of this claim." <u>Davis v. Sec'y for the Dep't of Corr.</u>, 341 F.3d at 1315 (citing <u>Joiner v. State</u>, 618 So.2d 174, 176 (Fla. 1993); <u>see</u> <u>also</u> <u>Melbourne v. State</u>, 679 So.2d 759, 765 (Fla. 1996)).

counsel, here, chose.  Given defense counsel's actions based on the record before this Court, defense counsel's performance was not deficient.

Petitioner specifically states that the State struck two African-American prospective jurors (Mr. Francis and Ms. Barbara Harris) during voir dire.  Third Amended Petition at 59-69; Reply at 22.  The pertinent portions of the voir dire record reflect the following.  The State moved to strike Ms. Barbara Harris, an African-American prospective juror, during jury selection by using a peremptory challenge.  Tr. at 83.  Defense counsel did <u>not</u> object or question the prosecutor's reason for the strike.  The record, however, clearly reflects the prosecutor's reason.  Ms. Harris stated that she had a son who she thought had been treated unfairly the second time he was arrested.  <u>Id</u>. at 31-32.  She specifically noted that this would affect her ability to be fair and impartial in the trial.  <u>Id</u>. at 32-33.  Understandably, this would be a grave concern for the State and a race neutral reason for striking her.  Defense counsel's failure to object was not deficient performance.

Thereafter, the State moved to strike Robert C. Francis, Sr., by using a peremptory challenge.  Tr. at 86.  Defense counsel did object, stating "this is the second strike of an African American."  <u>Id</u>.  The prosecutor responded that Mr. Francis "has a criminal record and furthermore he has a son in prison for breaking and entering."  <u>Id</u>.  Mr. Francis had previously stated, during voir

52

dire, that his son "is in prison on account of drugs" for the charge of breaking and entering.   Tr. at 33-34.   When defense counsel noted that the criminal record was not mentioned during voir dire, the prosecutor responded:

> We have a copy that shows he has a criminal record, but obviously we don't need anything.   We need to give a race neutral reason which that is.   Those are two race neutral reasons that applies [sic] specifically to this individual.

Id. at 86-87.   The trial judge allowed the strike of Mr. Francis. Id. at 87.   Based on the voir dire transcript, defense counsel's failure to preserve the Batson issue for appeal was not deficient performance.

Thus, the record is clear that Mr. Francis was struck by the State both because of his prior criminal record and the fact that his son was in prison on account of drugs.   Certainly, this is a genuine, credible non-racial reason that was properly accepted by the trial judge.   Moreover, Ms. Harris testified that she could not be fair or impartial because she believed her son had been treated unfairly regarding his second arrest.   Again, the record reflects a non-racial reason for the prosecutor's striking her.

Even assuming arguendo deficient performance by defense counsel, Petitioner has not shown prejudice.   "[T]he appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." Davis v. Sec'y for the Dep't of Corr., 341 F.3d at 1316 (citation

omitted).    Here,  Petitioner  has  not  shown  such  a  reasonable

likelihood  of  a  more  favorable  outcome  on  appeal  if  Mr.  Hernandez

had  preserved  the  <u>Batson</u>  claim  for  appellate  review.

Thus,  for  all  of  the  above-stated  reasons,  the  Third  Amended

Petition  will  be  denied,  and  this  case  will  be  dismissed  with

prejudice.

Therefore,  it  is  now

**ORDERED AND ADJUDGED:**

1.    The  Third  Amended  Petition  (Doc.  #50)  is  **DENIED**,  and  this

action  is  **DISMISSED WITH PREJUDICE.**

2.    The  Clerk  of  the  Court  shall  enter  judgment  denying  the

Third  Amended  Petition  and  dismissing  this  case  with  prejudice.

3.    The  Clerk  of  the  Court  shall  close  this  case.

**DONE  AND  ORDERED**  at  Jacksonville,  Florida,  this  6th  day  of

September,  2005.

**TIMOTHY J. CORRIGAN**
United States District Judge

sc 9/1
c:
Vernon Pinckney
Ass't Attorney General (Kruse)